UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| US AIRWAYS, INC., *et al.* | ) | Case No. 04-13819-SSM |
| | ) | Chapter 11 (Jointly Administered) |
| Debtors | ) | |

**MEMORANDUM OPINION**

Before the court is the motion of the debtors in possession for approval of a severance and retention program – referred to as the Transaction Retention Program or TRP – for executives of the company and for over 1800 management employees. The motion is supported by the Official Committee of Unsecured Creditors (which negotiated a number of changes to the original proposal) but is opposed by the United States Trustee and by the unions representing the debtor's pilots, flight attendants, mechanics, and reservation agents.[1] Following an evidentiary hearing, the court took the motion under advisement. For the reasons stated, the court will approve the program for the non-officer management employees, but will require that the proposed new employment contracts for the officers be approved as part of a plan of reorganization.

---

[1] The unions are the Air Line Pilots Association, the Association of Flight Attendants, the Communications Workers of America, AFL-CIO, and the International Association of Machinists.

Background and Findings of Fact

US Airways, Inc., is the seventh largest airline in the United States. Together with its parent holding company and three affiliates,[2] it filed a voluntary chapter 11 petition in this court on September 12, 2004, and continues to operate as a debtor in possession. This is the company's second chapter 11 filing in approximately two years. The previous case was filed in August 2002. A plan of reorganization was successfully confirmed, and the company exited chapter 11 in March 2003.

Upon emergence from the first chapter 11 case, US Airways had what appeared to be a sound business plan based on its continued operation as a traditional hub-and-spoke carrier. The company's financial performance, however, did not live up to the projections upon which its business plan was based. The company attributed this failure largely to the unforseen effect that the penetration of low cost carriers was having on the market. The price competition from the low cost carriers was exacerbated by a dramatic rise in the cost of jet fuel. As a result, US Airways determined that it could not survive as a traditional or "legacy" carrier but would have to transform itself into a low cost carrier, and, more specifically, into what has been described as a "hybrid" low cost carrier on the model of America West.

Central to that transformation was bringing the company's labor costs in line with those of the low cost carriers. In the first chapter 11 case, the company's unionized work force had agreed to significant wage concessions. Now they were asked to agree to far more

---

[2] The debtors are US Airways Group, Inc., US Airways, Inc., PSA Airlines, Inc., Piedmont Airlines, Inc., and Material Services Co., Inc.

dramatic concessions. While negotiating with the unions, the debtors brought a motion under § 1113(e), Bankruptcy Code, for interim relief from its collective bargaining agreements. That motion, which was heard over several days in October 2004, resulted in a court-ordered interim 21% pay reduction. Subsequently, the debtors brought a motion under § 1113(c), Bankruptcy Code, to reject the collective bargaining agreements with the unions that had not yet agreed to wage and benefit cuts demanded by the company; a motion to terminate the remaining defined benefit pension plans for the unionized employees; and a motion to terminate retiree medical benefits. Those motions were heard over a number of days in December 2004. In the face of the motions, the unions eventually agreed to substantial wage and benefit cuts. Additionally, the defined benefit pension plans were terminated and replaced by less generous defined contribution plans. Although the company also imposed some pay cuts on its management employees, they were significantly less, in percentage terms, than those experienced by the unionized workforce.

  Despite the cost-cutting on the labor front, and despite considerable success in negotiating concessions from its largest creditors and obtaining commitments for capital infusions to finance its exit from chapter 11, the company's ability to proceed with its transformation plan and to emerge from chapter 11 as a stand-alone airline has been seriously undermined by the continued high price of jet fuel. In response, the debtors began serious discussions with America West earlier this year concerning a possible merger. (There had been earlier discussions between the two beginning in early Spring 2004. However, those discussions ended in mid-Summer 2004). The renewed negotiations have culminated in an written merger agreement that would have to be approved as part of a

chapter 11 plan in this case. Under the proposed merger, the combined airlines would operate under the US Airways name, but the US Airways headquarters would be relocated from Arlington, Virginia, to Tempe, Arizona (where America West's headquarters is located), and America West's chief executive officer would become the chief executive officer of the combined company. Incident to the merger agreement, the debtors have lined up $500 million in equity investment that would be available to the merged airline.

The current employment contracts for the company's executives contain severance provisions that could fairly be described as generous. There is also a company severance plan that covers approximately 1873 management employees.[3] Neither that severance plan nor the executive employment contracts have been assumed, however. In addition – through what has been described as an oversight – the existing severance plan for the management employees does not apply to involuntary terminations in the context of a "change of control," such as a merger. As explained by the company's witnesses, at one point the company had two severance policies: one that applied to change-of-control terminations, and one that applied to all other terminations. The change-of-control severance policy was more generous than the normal severance policy. The company rejected the change-of-control policy during the first chapter 11 case, intending to have a single severance policy that applied in all contexts. Unfortunately, no one focused on the need to remove from the general policy the language expressly *excluding* terminations arising from a change of control. Thus, as the severance policy is currently written, management employees who lose

---

[3] The actual number of employees currently covered by the plan is somewhat fewer because of continued attrition since the motion was filed.

their jobs as a result of the merger – and the number who are expected to do is somewhere between one-third and one-half (not including approximately 300 employees in the company's operations center in Philadelphia who are expected to keep their jobs) – will receive *no* severance.

The proposal that is currently before the court has a number of elements. First, the existing severance policy for management and salaried employees would be amended to include terminations arising from a change-of-control as a covered event. Second, the minimum severance payable in the event of a change of control would be increased to 12 weeks. (The existing severance policy – which is based on length of service – ranges from 2 weeks for employees with less than a year of service to 26 weeks for employees below the managing director level with 20 or more years of service and up to 52 weeks for employees at the managing director level. The raise in the minimum benefit would affect only employees below the managing director level with less than 10 years of service and managing directors with less than 6 months of service. The existing severance benefits would otherwise remain unchanged.) Third, the company would have the ability, from a $5 million pot, to offer bonuses to critical employees below the officer level – payable only when the employee was ultimately terminated – of up to $50,000 to stay with the company through the merger period, which is expected to take up to two years. And finally, 24 executives – consisting of the chief operating officer, 9 executive vice-presidents and senior vice-presidents, and 14 vice-presidents – would receive new employment contracts providing for a lower level of severance pay than their existing contracts. For executives above the rank of vice-president, the severance would be payable not only in the event of an

involuntary termination but also (in a reduced amount equal to one-half of the normal severance) if the executive voluntarily quits because his or her job was being moved more than 50 miles.  For vice-presidents, however, having to relocate because of a change of control would not constitute "good cause" for voluntary severance.

Since the severance payments are payable only if an employee remains with the company until his or her employment is involuntarily terminated (or, in the case of an officer, quits for "good cause," and since the number of employees who will actually lose their jobs is unknown, the company's witnesses were not able to put a precise figure on the cost of the retention program.  In a "worst-case" scenario in which *all* of the officers and management employees other than the 300 or so at the operations center were involuntarily terminated, the total cost would be approximately $50.1 million ($30.8 million for the non-officer severance program, $5 million for the retention bonus program, and $14.3 million for the officer severance program).  In the more likely event that somewhere between one-third and one-half of the management employees and officers lost their jobs in a merger, the total cost would range from approximately $20 million to $28 million.

This figure assumes a plan is confirmed and the merger goes through.  Since none of the employees would be terminated prior to the merger, the severance costs would be paid by the merged company, not by the chapter 11 estate.  On the other hand, if the merger does not go through and if all the employees were terminated in the context of a liquidation, the administrative claim could exceed $50 million (since the operations center employees would now be included) and would be payable from the bankruptcy estate.  To reduce the risk of such a large administrative claim, the Official Committee of Unsecured Creditors has

negotiated an $8.8 million cap on the amount of officer severance payments and a $15 million cap on the amount of management severance and retention payments that would be entitled to administrative expense status in the event of a liquidation.

Conclusions of Law and Discussion

I.

The Bankruptcy Code does not specifically address so-called Key Employee Retention Plans, or KERPs, whether adopted before the filing of a bankruptcy petition or after. It is common, however, for bankruptcy courts to approve the adoption of post-petition KERPs, or the assumption of pre-petition KERPs, if the debtor has used "proper business judgment" in adopting the plan, and the plan is "fair and reasonable." *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001). Nevertheless KERPs have something of a shady reputation. All too often they have been used to lavishly reward – at the expense of the creditor body – the very executives whose bad decisions or lack of foresight were responsible for the debtor's financial plight. But even where external circumstances rather than the executives are to blame, there is something inherently unseemly in the effort to insulate the executives from the financial risks all other stakeholders face in the bankruptcy process. Congressional concern over KERP excesses is clearly reflected in changes to the Bankruptcy Code that will become effective for cases filed after October 17, 2005. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 331, 119 Stat. 23, 102-03 (April 20, 2005). Those changes will severely limit both the circumstances under which severance and retention payments may be made to insiders as well as the amount of such payments, which will be limited to 10 times the average amount

of severance or retention payments for non-management employees during the same calendar year.

## II.

The arguments put forth by the objecting parties may be succinctly stated. The United States Trustee urges that the program is overly broad; will undercut employee morale by sparing management from the financial sacrifices the unionized workforce has had to bear; could result in a very large administrative claim if the merger fails and the company has to liquidate; and should be adopted, if at all, only as part of a confirmed plan of reorganization. The unions echo most of the same concerns, emphasizing that the program is not sufficiently targeted; that it breaks the implied promise of "shared sacrifice" made during the negotiations and litigation that culminated in over $900 million of labor and retiree concessions; and that the lack of any provision for "mitigation" would allow a terminated officer or manager to draw full severance even if he or she were to be hired the next day at the same or a higher salary.

## A.

Before addressing those objections, the court must determine whether the debtors have made a threshold showing that they have used sound business judgment in adopting the plan. There can be little doubt, based on the evidence, that the plan is a response to a serious retention problem. In the eight months that the company has been in chapter 11, it has eliminated 35 open positions in its management ranks and involuntarily terminated 150 management employees. However, an additional 20 to 40 management employees have voluntarily left each month, only a small fraction of whom have been replaced by new hires.

The number of unfilled open positions currently stands at 340. If the exodus continues at the present rate, there simply will not be enough management employees left to see the company through the merger with America West. Although the company's uncertain financial prospects would likely have induced many of the departures in any event, the company believes that the merger announcement and the knowledge that a significant number of headquarters positions will be eliminated in the process is an additional incentive for management employees to leave now rather than stay with the company for the one or two years needed to conclude the merger.

The decision to implement a severance and retention program was not lightly made. The question of whether to seek approval for such a program was first raised in October 2004, a month following the chapter 11 filing. A presentation was made to the human resources committee of the company's board of directors. The chairman of that committee, Hans Mirka, is an outside independent director who is now retired but has over thirty years of experience in the airline industry, including a stint as the chief operating officer of Pan American Airways. At the time of the presentation, the company's motion for interim relief from its collective bargaining agreements was pending before this court. In any event, the board decided against pursuing a KERP program at that time and urged management (in Mr. Mirka's words) to "tough it out." It was only after additional attrition convinced the board that the management structure had become dangerously "hollowed out" that the board, after obtaining a second opinion from a law firm as to the reasonableness of the proposal, and after making its own changes to the management-proposed plan, decided to seek approval of the plan now before the court. The debtors presented testimony from a financial consultant

that the amount of the proposed severance and retention payments is in line with those approved in bankruptcy cases involving similar-size companies and is roughly at the 50th percentile of such benefits among low-cost airlines.

Accordingly, the court is satisfied that the company has carried its burden of showing that it used proper business judgment in adopting the plans it now seeks to have adopted and that it has made at least a threshold showing that the plans are fair and reasonable. The ultimate determination of whether the plans are fair and reasonable, however, requires careful consideration of the points raised by the unions and the United States Trustee.

B.

Of the objections to the program, surely the most compelling, from a purely human point of view, is that it represents a betrayal of the principle of "shared sacrifice" that was championed by the company in the litigation and negotiations that resulted in over $900 million of wage and other concessions by its unionized workforce. While management employees took some pay cuts and benefit reductions, the plain truth is that those cuts were significantly less than the cuts experienced by the non-management employees. It is hardly any wonder, therefore, that the rank and file employees have reacted to the proposal with considerable outrage, as evidenced, for example, by the petition that was admitted at the hearing signed by 2,209 members of the Communications Workers of America denouncing the proposed severance plan and urging this court not to approve it.

The court is certainly sensitive to what one witness described as the "uproar in the workplace" after the company announced it would seek approval of the severance plan. At the same time, the court cannot ignore the fact that the landscape has significantly changed.

At the time the labor concessions were negotiated, the company was headed along a particular path, that of transformation. Now it is headed on a different path, that of merger. Under a transformation plan, employees – whether management or rank and file – were equally likely to keep their jobs (if the company successfully emerged from chapter 11 as a viable airline) or to lose them (if the company had to liquidate). Under the proposed merger, by contrast, few of the unionized employees are likely to face the loss of their jobs, since there is little overlap in the route structure of the two airlines. However, somewhere between one-third and one-half of the management employees are expected ultimately to lose their jobs. The problem the company faces is that those management employees will be needed up until the day their employment is terminated, perhaps two years from now. If they leave too soon, the merger itself (and with it, the jobs of the rank and file employees) will be threatened.

      The argument that the program is too broad and that any retention benefits should be narrowly targeted to "critical" or "key" employees likewise misses the mark. The evidence at the hearing convincingly established that the headquarters organization cannot afford further attrition without effectively eliminating its ability to carry the company through the merger. Put another way, once a football team has been reduced to 11 players, every one of them is "critical," since you cannot field a team with fewer.

      Nor will anyone receive money for simply agreeing to stay on. The severance and retention payments for management employees will only be paid if the employee in question actually remains until the day his or her services are no longer needed. The cost, moreover, is not likely to be anywhere near the $55 million reported in the press. Given the estimate of

11

somewhere between one-third and one-half of management and executive jobs at risk, the cost of the severance and retention payments is in the more probable range of $20 million to $28 million if the merger goes through. If the company, for whatever reason, is unable to emerge from chapter 11 and must liquidate, the administrative claim that would be borne by the bankruptcy estate would be limited to $23.8 million. While that is still a lot of money, it is a far cry from the $55 million figure that has been thrown about.

C.

There are, however, two additional issues for consideration. The first is whether approval of the severance plan should await confirmation of a plan of reorganization, and the second is whether there should be some provision for "mitigation."

The argument in favor of requiring that the severance and retention plans be approved only as part of a confirmed plan relies on the reasoning of the Second Circuit in *Committee of Equity Security Holders v. The Lionel Corp. (In re The Lionel Corp.),* 722 F.2d 1063 (2d Cir. 1983). *Lionel* dealt with a proposed pre-confirmation sale of the debtor's most valuable asset, an 82% stake in a profitable, publicly-held company whose shares were not declining in value. The specific holding in that case is that a sale of assets outside the ordinary course of business should be approved prior to confirmation only if there is "a good business reason" for doing so and the sale will "further the diverse interests of the debtor, creditors and equity holders, alike." *Id.* at 1071. Approval of an employee retention program is obviously not the same thing as the sale of the debtor's most valuable asset. Additionally, the holding in *Lionel* relied heavily on a long history of practice that focused specifically on asset sales in reorganization cases. But many of the prudential concerns

12

underlying *Lionel* would apply to other types of non-ordinary course transactions as well. For example, among the factors the Second Circuit identified as relevant to the decision whether to approve a non-ordinary course asset sale were "the amount of elapsed time since the filing [of the bankruptcy petition], the likelihood that a plan of reorganization will be proposed and confirmed in the near future, [and] the effect of the proposed disposition on future plans of reorganization." *Id.* In the present case, the severance plans, by creating significant liabilities that do not presently exist, may preclude or limit the consideration of alternative reorganization plans to the merger proposal. Additionally, since the purpose of the plan is to facilitate the proposed merger, it seems premature – when a plan and disclosure statement have not yet been filed – to saddle the estate with a large potential administrative expense liability should the merger not go through. To be sure, the risk of a large administrative expense has been significantly reduced as a result of the caps negotiated by the Official Committee of Unsecured Creditors, but it has not been eliminated.

The argument in favor of a provision for mitigation is likewise straight-forward. *See In re Geneva Steel Co.*, 236 B.R. 770 (Bankr. D. Utah 1999). The purpose of severance pay is to protect against financial hardship by compensating for the loss of income that frequently follows upon involuntary termination. *Id.* at 773 ("[I]t makes sense ... to provide a severance benefit ... through a period of unemployment."). The more generous the severance, the more time a terminated employee can take to search for a new position rather than being forced by economic necessity to take the first job offer, however marginal, that comes along. Nevertheless, severance is not intended as a bonus for being terminated and should not be used to provide a windfall to an employee who, rather than experiencing a

13

protracted loss of income while searching for a new position, finds a job the next day at an equivalent salary. *Id.* ("[I]t does not make sense ... to provide the senior executives with a windfall.") The court accepts that designing a program to protect against that possibility may present administrative challenges and would probably have to take the form of a salary continuation program rather than a more traditional lump-sum severance payment. The burden of administering such a program might well not be justified where the amount of severance is relatively small – for example, where severance amounts to six months or less of pay. But certainly where severance is measured in multiples of annual base pay, a much stronger case can be made that the administrative burden of monitoring whether the terminated executive has obtained follow-up employment at an equivalent or better salary is outweighed by the potential savings to the company and the protection of the estate against an unjustified administrative claim.

D.

In any event, given the magnitude of the proposed severance payments for the officers, the lack of any provision for mitigation, and the ability of the officers at the most senior level to collect severance (although at a reduced amount) simply because they might not want to move to Arizona, the court agrees with the United States Trustee that approval of new employment agreements for the officers should await plan confirmation. The reasonableness of the contracts can then be judged in light of the actual plan terms (including distributions to the various classes of creditors), and creditors will have had an opportunity to vote.

14

With respect to management employees below the officer level, however, the court reaches a different conclusion. Based on the testimony presented at the hearing, it seems clear that the company is experiencing a serious exodus of management employees that threatens its ability to reorganize and calls for immediate action in order to keep the organization functioning until a plan can be confirmed and the merger consummated. Given the rate of departures since the filing of the chapter 11 petition, the court agrees with the debtors that a promise of severance that is conditional upon confirmation of a plan is not likely to be effective as an inducement to stick with the company. For that reason, the court will approve the proposed severance and retention program for the non-officer management employees, subject to the limitations negotiated by the Official Committee of Unsecured Creditors.

A separate order will be entered consistent with this opinion.

Date: _____          _____
                                      Stephen S. Mitchell
Alexandria, Virginia                  United States Bankruptcy Judge

Copies to:

Brian P. Leitch, Esquire
Arnold & Porter LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado   80202
Counsel for the debtors in possession

Lawrence E. Rifken, Esquire
McGuireWoods LLP
1750 Tysons Blvd., Suite 1800
McLean, VA   22102-4215
Local counsel for the debtors in possession

Scott L. Hazan, Esquire
Otterbourg, Steindler, Houston
& Rosen, PC
230 Park Avenue
New York, New York   10169-0075
Counsel for the Official Committee of Unsecured Creditors

Malcolm Mitchell, Esquire
Vorys, Sater, Seymour & Pease, L.L.P.
277 South Washington Street, Suite 310
Alexandria, VA  22314
Local counsel for the Official Committee of Unsecured Creditors

Dennis Early, Esquire
Assistant United States Trustee
115 South Union Street, Suite 210
Alexandria, VA  22314

Richard M. Seltzer, Esquire
Cohen, Weiss and Simon LLP
330 West 42nd Street
New York, NY   10036
Counsel for the Air Line Pilots Association

Daniel M. Katz, Esquire
Katz & Ranzman, P.C.
1015 18th Street, N.W.
Suite 801
Washington, D.C.   20036
Counsel for the Communications Workers of America, AFL-CIO

Jeffrey A. Bartos, Esquire
Guerrieri, Edmond & Clayman, PC
1625 Massachusetts Avenue, NW
Suite 700
Washington, DC   20036-2243
Counsel for the Association of Flight Attendants

S. Jason Teele, Esquire
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ   07068
Counsel for the International Association of Machinists