UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| US AIRWAYS, INC., *et al.* | ) | Case No. 04-13819-SSM |
| | ) | Chapter 11 (Jointly Administered) |
| Debtors | ) | |

**MEMORANDUM OPINION**

Before the court is the motion of the reorganized debtor for summary judgment on its objection to Claim No. 3018 filed by Fougére Holcombe in the amount of $60,475,000 for alleged employment discrimination in violation of the Americans with Disabilities Act ("ADA"). The motion raises two distinct issues: first, whether as a matter of law the claim was discharged in the debtor's prior chapter 11 case; and second, whether Ms. Holcombe could perform the essential functions of the position from which she was placed on medical leave in 2003 and ultimately terminated in 2006. Because the court agrees that the claim was discharged in the debtor's prior case, the court need not reach the second issue and will grant summary judgment disallowing the claim.

Background

Ms. Holcombe was employed as a fleet service agent by US Airways, Inc. ("US Airways") from 1992 to 2003, at LaGuardia International Airport in Flushing, New York, and remained nominally an employee, albeit in a non-pay status, until she was terminated in 2006. Fleet service agents, who are represented by the International Association of Machinists, AFL-CIO ("the IAM") may be assigned either to ramp service or tower service. Agents assigned to

1

ramp service rotate between loading and unloading cargo from the airplanes and the bag rooms, and work as bag runners who transport the bags between the terminal and the airplane. Agents assigned to tower service direct and coordinate the takeoff, landing, and movement of airplanes and rotate between positions of central load planning, running shuttle operations, and ramp/passenger services coordination. Three shifts are available on tower service: daylight, evening, and "open-time." The open-time shift consists entirely of covering the shifts of other employees who are absent.

US Airways, together with its parent holding company and several affiliates, filed a petition for reorganization under chapter 11 of the Bankruptcy Code in this court on September 12, 2004. This was the company's second chapter 11 filing. It had previously filed a chapter 11 petition in this court on August 11, 2002. *In re US Airways, Inc.*, Case No. 02-83985-SSM.[1] A plan was confirmed in the first case on March 18, 2003. The bar date in that case for non-governmental creditors to file claims was November 4, 2002,[2] and the bar date for filing requests for payment of administrative expenses was 45 days after the May 15, 2003 "effective date" of the plan, or June 30, 2003. The administrative claims bar date was set forth in § 10.4 of the plan and ¶ 27 of the confirmation order, and it was served on parties and claimants

---

[1] The case was jointly administered with *In re US Airways Group, Inc.*, No. 02-83984-SSM, which was designated as the lead case.

[2] The order establishing the claims bar date did provide an exception for "[a]ny present or former employee of one of the Debtors . . . *solely with respect to any Claim based on the payment of wages, salaries and benefits* authorized to be paid by order of the Court . . . unless the Debtors have provided written notice to an employee that it does not intend to exercise authority to pay such Claim, in which case the employee shall have until the later of (I) the General Bar Date or (ii) 30 days from the date of written notice, to file a Proof of Claim." (emphasis added).

in the first case and published in The New York Times and The Wall Street Journal. In the first case, Ms. Holcombe filed neither a proof of claim nor a request for allowance of an administrative expense despite the fact that on October 9, 2002—just two months after the first case was filed—she had filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the ADA extending back to December 3, 2001. She received a right-to-sue letter from the EEOC on July 2, 2003, and thereafter filed suit in federal district court. That suit was stayed by the filing of the second chapter 11 case, and Ms. Holcombe filed the proof of claim that is now before the court.

US Airways does not dispute that it is a covered employer or that Ms. Holcombe is a person with a disability within the meaning of the ADA. Ms. Holcombe has experienced intestinal problems since she was a child, but it was not until 1991 that her symptoms worsened. Sometime between 2000 and 2001, she was diagnosed with Crohn's disease accompanied by ileocolitis, a motility disorder, intestitial cystisis, a fistula problem, lesions, and a levator spasm, which is very active at night.[3] Ms. Holcombe experiences chronic pain, diarrhea, and bleeding that require frequent, and sometimes lengthy, trips to the bathroom. Her symptoms are most severe at night and even in the daytime she cannot engage in heavy lifting.

US Airways learned of Ms. Holcombe's medical condition in 1991. On January 12, 1996, Ms. Holcombe asked US Airways to accommodate her with special scheduling so she would only work daylight shifts. At the time, Ms. Holcombe was able, based on her seniority, to

---

[3] Crohn's disease is an incurable inflammatory bowel disease causing swelling in the intestines. For additional information on the symptoms, diagnosis, and treatment of Crohn's disease, see National Institute of Health, *Digestive Diseases A-Z List of Topics and Titles: Crohn's Disease*, http://digestive.niddk.nih.gov/ddiseases/pubs/crohns/ (Feb. 2006).

hold a 6:00 a.m. to 2:30 p.m. shift and was informed by letter on January 30, 1996 that no accommodation was necessary. Ms. Holcombe made a second request for a daylight shift on April 25, 1996.[4] On June 12, 1996, US Airways responded by offering Ms. Holcombe two options: (1) to take an assignment in passenger service as a paging/queue agent in a daylight shift that was available at the time without overstaffing or violating seniority, but with no guarantee that it would remain a daylight shift, or (2) to take an open-time shift in the tower, which US Airways would temporarily overstaff, until scheduled downsizing was completed in September 1996, at which point Ms. Holcombe could continue to hold the open-time position if she had the requisite seniority.[5] Ms. Holcombe elected to take the open-time shift.

In 2000, Ms. Holcombe took a seven or eight month leave of absence for surgery and returned to US Airways at the end of 2000. Between August 2001 and February 2002, she took another medical leave of absence. Ms. Holcombe met with Loretta Bove, the US Airways station manager at LaGuardia, in early January of 2002 to discuss her return to work. At this meeting, Ms. Holcombe requested three specific accommodations, two of which were that she must work a daylight shift and that she did not want to return as a tower agent and asked about the availability of corporate training positions. Ms. Bove stated that she would have to inquire into those two requests. Changes to the shift bidding system and a reduction in force had affected the seniority system at US Airways. In 2001, US Airways switched from a closed bid

---

[4] The summary judgment record is silent as to what change had occurred in the four months since the prior request.

[5] An employee on an open-time shift covers other employees who are absent from work due to an illness or vacation and the like.

system for all tower fleet service agents to an open bid system.[6]  Shifts were assigned based on a seniority system set up by the collective bargaining agreement with the IAM.  Additionally, after September 11, 2001, US Airways' operations at LaGuardia underwent a reduction in force, which had a significant impact on fleet service agents, especially those in the tower.  The number of tower agents went from 31 to 14.  After this reduction, Ms. Holcombe was one of the least senior tower agents, ranking tenth out of fifteen agents.

A January 25, 2002, letter from La'Shell Coleman, a human resources consultant with US Airways, denied Ms. Holcombe's request for a daylight shift because the daylight tower shift that she had prior to her medical leave of absence was no longer available and she lacked the requisite seniority to hold the position after the September 2001 reduction in force.  At the time, the only shifts available for Ms. Holcombe, based on her seniority, were evening shifts.

Ms. Holcombe returned to work on February 16, 2002 and worked a daylight shift for two weeks covering employees on vacation.  She was then assigned to a shift based on her seniority, regardless of whether it was a day or night shift.  In the early spring of 2002, US Airways offered Ms. Holcombe an available ramp position that would allow her to bid a daylight shift based on her seniority.  Ms. Holcombe did not accept this offer because she could not work the ramp position due to her medical condition.

On November 4, 2002, US Airways wrote the assistant chairman of the union asking for permission to violate the seniority provision of the collective bargaining agreement in order to accommodate Ms. Holcombe's request for a daylight shift.  The union declined to approve a

---

[6] In the closed system, employees could not use seniority to switch to a different shift but had to wait for a vacancy.  In the open system, an employee could bump a less-senior employee in any shift, including an open-time shift, at each regularly scheduled bidding cycle.

deviation from the seniority provisions. Meanwhile, in November 2002, Ms. Holcombe reached the necessary level of seniority to bid on a daylight shift at the next bid cycle. However, Ms. Holcombe was not happy with this shift because it was too busy and stressful, and she needed to be relieved during her frequent bathroom breaks, some of which were 30 minutes in length. In response, US Airways had the lead tower employee cover Ms. Holcombe during her bathroom breaks, which grew in frequency (to sometimes ten or more per shift) in 2002. Ms. Holcombe held this daylight shift until January 5, 2003 when a new bidding cycle went into effect the following day, and she was assigned a closing shift based on her seniority status. Ms. Holcombe did not return to work after being assigned this shift. She could not work a closing shift due to the severity of her nighttime symptoms from her Crohn's disease. On January 6, 2003, she again requested a daylight shift, but was informed by Ms. Bove in a letter dated January 30, 2003, that her request for a daylight position could not be met because no such position was available based on her seniority level. Consequently, Ms. Holcombe was placed on medical leave effective January 6, 2003. She remained on this medical leave of absence until, after three years on leave status, she was deemed to have resigned from US Airways as of January 1, 2006.[7]

Discussion

I.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

---

[7] The IAM's collective bargaining agreement mandated constructive resignation for employees who remained on leave status in excess of three years.

a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555, 91 L. Ed. 2d 265 (1985). In ruling on a motion for summary judgment, a court should believe the evidence of the nonmoving party, and all justifiable inferences must be drawn in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

II.

The threshold issue is whether Ms. Holcombe's claim is barred because it was discharged during the first US Airways case.

A.

With certain exceptions not applicable here, confirmation of a chapter 11 plan discharges a debtor "from any debt that arose before the date of such confirmation," regardless of whether a proof of claim was filed, the claim was allowed, or the holder of the claim accepted the plan. § 1141(d)(1)(A), Bankruptcy Code.[8] The Bankruptcy Code broadly defines a claim as "a right to

---

[8] Debts that arise after the filing of the bankruptcy petition but before confirmation are treated as administrative expenses, and, unlike prepetition claims (which may be compromised), must be paid in full in order for a plan to be confirmed. §§ 503(b) and 1129(a)(9)(A), Bankruptcy Code. For a request for payment to qualify as an administrative expense (a) the right to payment must arise from a post-petition transaction with the debtor's estate; and (b) the consideration supporting the right to payment must have been beneficial to the estate of the debtor. *See In re Hemingway Transp., Inc.*, 954 F.2d 1, 5 (1st Cir. 1992). For claims grounded in tort or violation of a regulation, the "benefit" requirement is satisfied if the underlying activity, such as operation of the debtor's business, was undertaken for the benefit of the estate. *See Reading Co. v. Brown*, 391 U.S. 471, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968) (decided under former Bankruptcy Act of 1898), and *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200 (1st Cir. 1985). In *Reading*, the Supreme Court held
(continued...)

7

payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 101(5)(A), Bankruptcy Code. Under this definition, a claim may exist for bankruptcy purposes even if suit could not yet be brought for it under non-bankruptcy law or the statute of limitations has not yet begun to run, provided that the event or events which give rise to the liability occurred prior to the bankruptcy filing or, in the chapter 11 context, prior to confirmation. *See In re Food Barn Stores, Inc.*, 175 B.R. 723, 728 (Bankr. W.D. Mo. 1994) (explaining that a claim will be treated as a prepetition claim for bankruptcy purposes even though it is merely contingent or is unmatured under state law).

The Fourth Circuit, like most others, has taken an expansive view of what constitutes a claim. In *Grady v. A. H. Robins Co.*, the issue was whether women who had been implanted with the debtor's contraceptive device, known as the Dalkon Shield, but who had not suffered any injury until after the company's chapter 11 filing, had a "claim" that was subject to the automatic stay. 839 F.2d 198 (4th Cir. 1988). The Fourth Circuit observed that courts have consistently taken a broad view of what constitutes a claim in the bankruptcy context and explained that Congress intended that "claim" be broadly construed to ensure that all of the debtor's legal obligations, "no matter how remote or contingent," are dealt with in the

---

[8](...continued)
that damage caused to adjacent premises when the bankrupt's building caught fire as a result of negligence by a workman hired by the chapter XI receiver was entitled to administrative expense treatment. Similarly, in *Charlesbank Laundry*, the First Circuit held that a civil compensatory fine for commission of a nuisance should be treated as an administrative expense. The reorganized debtor does not deny that if an actionable violation of the ADA had occurred subsequent to the filing of the petition, but before confirmation, it would be properly treated as an administrative expense.

bankruptcy, in order to promote the "broadest possible relief in the bankruptcy court." *Id.* at 200 (quoting H. R. Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), S. Rep. No. 989, 95th Cong., 2nd Sess. 21-22 (1978)); *see also Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S. Ct. 705, 708, 83 L. Ed. 2d 649 (1985) (recognizing that the intent of Congress was to use a broad definition of "claim" in the bankruptcy context). Focusing on congressional intent, the Fourth Circuit rejected the Third Circuit's view in *In re M. Frenville Co.*, 744 F.2d 332 (3rd Cir. 1984) that a right to payment must exist pre-petition under applicable state law before a claim can exist in the bankruptcy context. *Id.* at 200-02. The Fourth Circuit held that the determination of when a claim "arises" for bankruptcy purposes is governed by federal bankruptcy law, not state law, and that there does not need to be an immediate right to payment when the acts upon which the claim was based occurred pre-petition. *Id.* at 200-203. The Court held, therefore, that the plaintiff's claim in that case arose pre-petition when the Dalkon Shield was inserted, even if her injury manifested post-petition and was therefore contingent on the petition date. *Id.* at 202-03.

Although the *Grady* decision involved the automatic stay rather than the discharge injunction, the same reasoning would apply, since the discharge injunction, like the automatic stay, bars efforts to collect "claims" as a liability of the debtor. Lower courts within the Fourth Circuit, including this court, have consistently followed *Grady* in its broad view of what constitutes a "claim." *In re Camellia Food Stores, Inc.*, 287 B.R. 52, 57 n.2 (Bankr. E.D. Va. 2002) (noting that the Fourth Circuit in *Grady* adopted a conduct test and rejected the accrual test used by the Third Circuit in *Frenville*); *see also In re Bentley Funding Group, LLC*, 2001 WL 34054525 (Bankr. E.D. Va., Feb. 2, 2001) (surety's post-petition performance of debtor's pre-petition subdivision bonding obligations was a prepetition, not post-petition, claim because

9

the surety's right to indemnity existed as a contingent claim from the date the indemnity agreement was executed.); *In re Dornier Aviation (North America), Inc.*, 2002 WL 31999222 (Bankr. E.D. Va., Dec. 18, 2002) (severance pay claim of employee who was not terminated until 86 days after chapter 11 was filed was nevertheless a prepetition, not post-petition, claim where the employment contract under which the claim arose was entered into prior to the bankruptcy filing).

B.

Turning to the present controversy, it is clear that the essential events giving rise to Ms. Holcombe's claim occurred prior to confirmation of the plan in the first chapter 11 case.[9] At oral argument, Ms. Holcombe's counsel stressed that his client was essentially forced into the medical leave from which she was ultimately terminated by two events: (1) US Airways' alleged withdrawal in January 2002 (seven months prior to the filing of the first chapter 11 case) of the accommodation that Ms. Holcombe had enjoyed since 1996 of being able to work a daylight shift;[10] and (2), the company's refusal in the November 2002 to January 2003 time frame to

---

[9] Certainly, US Airways' alleged withdrawal in January 2002 of the accommodation (in the form of a daytime tower shift) that Ms. Holcombe says she had enjoyed since 1996 would give rise not merely to a pre-confirmation claim, but a prepetition claim, in the first case. Everything else, it could be argued, inexorably flowed from her inability to retain a daylight shift. But whether a portion of her claim would properly be treated as arising postpetition rather than prepetition is immaterial, since in any event the last significant act occurred prior to confirmation.

[10] US Airways vigorously disputes Ms. Holcombe's assertion that the 1996 letter granted an "accommodation" beyond September of that year. Indeed, both in her EEOC charge and in her deposition testimony, Ms. Holcombe states that, based on the bidding system then in effect, she was able to "accommodate myself." Because in any event the claim is barred by the discharge in the prior case, the court need not determine whether the change in the bidding system constituted a "withdrawal" of a prior "accommodation."

allow anyone other than a supervisor to cover for Ms. Holcombe when she needed to take a bathroom break. Even accepting Ms. Holcombe's view of the facts, the last significant event was the January 30, 2003, letter denying her January 6, 2003, accommodation request and placing her on medical leave, the subsequent January 1, 2006 termination simply following as a matter of course. The chapter 11 plan, as noted, was confirmed some six weeks after the January 30, 2003, letter. Thus all of the relevant acts underlying Ms. Holcombe's claim occurred prior to the March 18, 2003 confirmation date in the first bankruptcy case. As a result, her claim was discharged in that case and is now barred by the discharge injunction. §§ 1141(d)(1)(A) and 524(a)(2), Bankruptcy Code.

       The fact that Ms. Holcombe did not receive a right-to-sue letter from the EEOC until July 2, 2003, some three and a half months after confirmation, does not change the analysis. Receipt of a right-to-sue letter from the EEOC is simply a procedural requirement for filing a civil action, it does not give rise to the claim. *McSherry v. Trans World Airlines, Inc.*, 81 F.3d 739, 741 (8th Cir. 1996). In *McSherry*, the Eighth Circuit considered whether a terminated pilot's ADA claim for discriminatory termination was discharged in bankruptcy where confirmation occurred after the employee's termination, but before he received his right-to-sue letter from the administrative agency investigating his complaint, and he failed to file a timely proof of claim. The Eighth Circuit held that the employee had a claim within the meaning of § 101(5)(A), Bankruptcy Code, despite its contingent and unmatured nature at the time the bankruptcy case was filed. *Id.* at 740. The Court explained that the definition of a claim in the bankruptcy context is broad enough to include a legal obligation despite the fact that a civil action would be premature because jurisdictional prerequisites have not been met. *Id.*; *see also O'Loghlin v.*

*County of Orange*, 229 F.3d 871 (9th Cir. 2000) (following *McSherry* and holding that employee's claim against county based on pre-discharge violations of the ADA was a claim within the meaning of § 101(5)(A) and thus subject to the discharge, even though employee did not receive her right to sue letter from the EEOC until after the county received its discharge). As discussed above, the pertinent events related to Ms. Holcombe's discrimination claim against US Airways all occurred pre-confirmation and whether her claim arose pre- or post-confirmation for bankruptcy purposes does not depend on receipt of her right to sue letter. Consequently, because she did not file a timely proof of claim or request for payment of an administrative expense in the first case, her claim does not survive the discharge that was granted in that case.

III.

Because the court concludes that Ms. Holcombe's claim is barred by the discharge in the first US Airways case, the court need not reach the issues of whether Ms. Holcombe was, as US Airways contends, unable to perform the essential duties of her position because of her need for frequent and lengthy bathroom breaks or whether, as Ms. Holcombe contends, US Airways failed to provide her with a reasonable accommodation when it changed its bidding system so that she was no longer assured of a daytime position or when it did not permit her duties to be covered by fellow employees below the supervisor level when she needed to take a bathroom break or when it placed her on medical leave rather than assign her to another position. On at least some of these issues, the evidence is sufficiently controverted that summary judgment would likely not be appropriate in any event. But because the court need not make that

determination, the court declines to do so. A separate order will be entered consistent with this opinion granting the motion for summary judgment and disallowing Ms. Holcombe's claim.[11]

Date: _____          _____
                                      Stephen S. Mitchell
Alexandria, Virginia                  United States Bankruptcy Judge


Copies to:

Amy Morrissey Turk, Esquire
McGuireWoods LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Counsel for the reorganized debtor

Kenneth H. Rosenau, Esquire
Rosenau & Rosenau
1304 Rhode Island Avenue, NW
Washington, DC 20005
Counsel for the claimant

Malcolm Mitchell, Esquire
Vorys, Sater, Seymour & Pease, L.L.P.
277 South Washington Street, Suite 310
Alexandria, VA  22314
Local counsel for the Official Committee of Unsecured Creditors

Dennis Early, Esquire
Assistant United States Trustee
115 South Union Street, Suite 210
Alexandria, VA  22314

---

[11] The reorganized debtor's request for an award of costs and attorneys fees in defending the claim is denied.