UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                                    )
                                          )
    US AIRWAYS, INC., *et al.*               )    Case No. 04-13819-SSM
                                          )    Chapter 11 (Jointly Administered)
               Debtors             )

## MEMORANDUM OPINION

Before the court are cross-motions for summary judgment on the objection of the reorganized debtors to Claim No. 3498 filed by Roger N. Thomas for retiree benefits.[1] Mr. Thomas is a former pilot whose grievance against Piedmont Airlines, Inc. ("Piedmont") for wrongful termination of employment was settled in 1996 by an agreement that, among other things, expressly preserved any claim to Mr. Thomas's "previously vested retirement interest." Piedmont, as reorganized debtor, does not dispute that Mr. Thomas, having now reached the age of 60, is entitled to payments under the retirement plan for Piedmont's pilots. It does dispute, however, that he has a claim for other benefits (such as free travel and payment of a "Social Security bridge") to which retired pilots are entitled. A hearing was held on February 21, 2008, at which the court heard the contentions of the parties and allowed 20 days for the filing of supplemental affidavits and exhibits. The parties have done so, and the issues are ripe for

---

[1] The objection is set forth in the debtors's Second Omnibus Objection to Claims filed on June 28, 2005 (Doc. # 2329). As originally filed, the claim did not specify a dollar amount. In his request for hearing on the objection, Mr. Thomas stated that the amount of the claim should be adjusted to $485,042.79.

1

determination. For the reasons stated, the court agrees with the reorganized debtors that Mr. Thomas's claim for benefits other than the pension payments must be denied.

Background

Mr. Thomas began employment as an airline pilot with what was then known as Henson Airlines, Inc. ("Henson") in 1988. Sometime thereafter, Henson was either merged into or became Piedmont, which operated under the name US Airways Express. Both before and after the merger, the pilots of Henson were represented by the Air Line Pilots Association International ("ALPA") as their bargaining agent. In 1995, Mr. Thomas's employment was involuntarily terminated, and he filed a grievance against the company through ALPA. That grievance was settled by a three-party agreement dated March 21, 1996, signed by Piedmont, ALPA, and Mr. Thomas. Under the agreement, Mr. Thomas received payment of $26,500.00 and released Piedmont from "all claims or causes of action . . . arising or claiming to arise out of his employment or cessation of employment from the Company." Central to the present controversy, the release paragraph included the following language: "This release is made without prejudice to and does not serve to bar any claims arising from Thomas' previously vested retirement interest." Mr. Thomas was 48 years old at the time his employment was terminated.

On September 12, 2004, Piedmont, together with its parent holding company (US Airways Group, Inc.) and several affiliates, filed a voluntary petition in this court for reorganization under chapter 11 of the Bankruptcy Code. A joint reorganization plan was confirmed on September 16, 2005, that, among other provisions, assumed the Retirement Plan for Pilots of Piedmont Airlines, Inc. This was the second chapter 11 case filed by Piedmont.

The first case was filed on August 11, 2002, and resulted in a joint reorganization plan that was confirmed on March 18, 2003. That plan likewise assumed the retirement plan for Piedmont pilots.

Relevant to the present controversy, the retirement plan (which had been amended and restated effective January 1, 2001) recited that it was the successor to the former Retirement Plan for Employees of Henson Aviation Inc. It further stated:

> Any pilot-participant or beneficiary who was not receiving benefits under the Henson Plan immediately prior to the Effective Date, but who is, or would have become, entitled to receive benefits under the Henson Plan on account of being an employee but who retired, died, or otherwise terminated employment prior to the Effective Date [of the Piedmont Plan], shall be entitled to receive benefits under the plan in the same form, amount, and under the same conditions that such benefit would have been payable under the Henson Plan.

Section 4 of the plan addresses the benefit payable to a plan participant "who retires from the employ of the Employer on his Normal Retirement Date." Normal Retirement Date is defined as "the date on which the participant attains his federally mandated retirement age," which the parties agree was 60 at the time Mr. Thomas's employment was terminated and the settlement agreement signed, but which is now 65. Section 5 of the plan addresses the benefit payable to a plan participant "who retires from the employ of the Employer within the ten-year period immediately prior to his Normal Retirement Date" or whose employment "continue[s] after his Normal Retirement Date." Section 6 of the plan, captioned "Social Security Supplemental Benefit," provides an additional benefit (which the parties have referred to as the "Social Security bridge") to a participant "who is required by Federal law to retire prior to age 65 and who retires from the employ of his Employer on Normal Retirement Date." The benefit, which is payable until age 65, is the amount the participant would have received from Social Security

"at social security retirement age." Finally, Section 7 of the plan, captioned "Termination of Employment and Vested Retirement Income," provides as follows:

> Each Participant who terminates employment with the Employer, and who is not eligible to receive retirement income in accordance with the preceding Sections, will be eligible to receive a vested retirement income, commencing upon the first day of the month coinciding with or next following the month in which he attains his Normal Retirement Date, provided his Vesting Percentage is other than 0%.

"Vesting Percentage" is defined as 0% for a participant with less than five years of service and 100% for a participant with five or more years of service. The amount of the "vested retirement income" is computed by reference to "normal retirement income," which Section 4 of the plan fixes as 1% of the participant's final average earnings multiplied by years of credited service accruing on and after January 1, 1989. A number of payment options are provided, including a joint and survivor annuity if the participant is married on the benefit commencement date.

During the first chapter 11 case, the court established a deadline of November 4, 2002, for non-governmental entities to file proofs of claim. Mr. Thomas was not listed as a creditor in the first case and was not mailed notice of the commencement of the case or of the claims bar date. Notice of the claims bar date was, however, published in three newspapers with a national circulation: the New York Times, the Wall Street Journal, and USA Today. Mr. Thomas did not file a proof of claim in the first case. He did, however, file a timely proof of claim (in letter form) in the second case. The claim provides a factual background, describes the basis for the claim as "vested retirement rights based on both years of service and bargained grievance settlement," and attaches a number of documents but does not assert entitlement to a specific dollar amount. Mr. Thomas did, however, state in his request for hearing that the amount of his

4

claim should be "adjusted" to $485,042.79, although no calculation was provided to show how that amount is derived.

In his response to the reorganized debtors's motion for summary judgment, Mr. Thomas provided copies of excerpts from what he stated were the relevant provisions of the pension plan and ALPA contract in effect at the time his grievance was settled, and which he contends were implicitly referenced by the settlement agreement. In particular, he points to the provisions of the collective bargaining agreement and a "side letter" signed by Henson and ALPA concerning free travel by retirees. The collective bargaining agreement provides as follows:

> To the extent permitted by law, a "retired" pilot, his spouse, and dependents shall be granted pass privileges on line to the same extent as an active pilot and offline in accordance with applicable agreements. "Retired" for the purpose of this provision means any pilot who has attained the age of 60 and has at least 10 years of active service as a Henson employee or who has attained the age of 55 and whose age plus years of active service as a Henson employee equals at least 70.

(quotation marks in original). The side letter expands this slightly:

> It is understood that pilots on the Henson Pilots' Seniority List as of December 1, 1989 are eligible for the pass privileges described in Section 23.G of the Agreement when they leave employment as a Henson pilot at age 60, irregardless of whether they meet the definition of "Retired" pilot contained in Section 23.G.

Section 27 of the collective bargaining agreement, captioned "Retirement," states that pilots would be permitted to participate in the Henson 401(k) savings plan and in the "Retirement Plan for Employees of Henson Aviation, Inc. (the defined benefit plan)." Relevant to the latter, the agreement provided:

> As applied to pilots, the defined benefit plan shall provide participation, vesting, retirement benefits (including social security supplement benefit) and related provisions no less favorable than those set forth in the defined benefit plan presented to the pilots November, 1989[.]

Discussion

I.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1985).  In ruling on a motion for summary judgment, a court should believe the evidence of the non-movant, and all justifiable inferences must be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In the present case, none of the determinative facts are in dispute, and the issues are purely those of contract interpretation and the effect of plan confirmation in the first chapter 11 case.

II.

At the outset, it is worth emphasizing what is and is not in dispute.  The reorganized debtors do not dispute that Mr. Thomas is entitled to receive benefits under the Retirement Plan for Pilots of Piedmont Airlines, Inc.  With regard to those benefits, it is doubtful whether Mr. Thomas has a claim at all under the chapter 11 plan, since the debtors's obligations under the retirement plan have been assumed by the reorganized debtors.  Accordingly, any claim for payment of benefits under the retirement plan is properly asserted against the reorganized debtors, not against the bankruptcy estate.  Indeed, it is doubtful that this court would have

subject-matter jurisdiction to resolve a dispute solely over the timing or amount of benefits payable to Mr. Thomas under the assumed retirement plan. *Valley Historic Ltd. Partnership v. Bank of New York*, 486 F.3d 831 (4th Cir. 2007). Be that as it may, it is apparent that Mr. Thomas's claim is not limited to his vested interest in the retirement plan but extends to additional benefits—including travel and the social security bridge—that he asserts are due him under the terms of the settlement agreement. Since the Chapter 11 plan did not assume Piedmont's obligations to Mr. Thomas under the settlement agreement, any otherwise valid claim he might have under the agreement—other than vested rights under the assumed retirement plan—would constitute a claim against the bankruptcy estate and is therefore properly before the court for determination.

III.

The reorganized debtors make two arguments in opposition to Mr. Thomas's claim for travel benefits and payment of the social security bridge. The first is that those benefits, which are not part of the assumed retirement plan, were discharged by plan confirmation in the first chapter 11 case. The second is that, even if they were not discharged, the settlement agreement simply cannot be read to include them. The court will address each of these arguments in turn.

A.

While it is undisputed that Mr. Thomas did not file a proof of claim in the first US Airways chapter 11 case, there is a dispute as to whether Mr. Thomas received adequate notice of the bankruptcy filing. It is well settled that creditors have a right to be notified of a bankruptcy filing that will affect their interest. In a chapter 11 case, a debtor that continues in business following confirmation of a plan of reorganization is discharged from all debts arising

prior to confirmation.  § 1141(d), Bankruptcy Code.  However, before such a claim can be discharged, creditors must be afforded adequate notice of the bankruptcy case, as well as of the deadline set for filing claims against the debtor.  *Zurich American Ins. Co. v. Tessler (In re J.A. Jones, Inc.),* 492 F.3d 242, 249 (4th Cir. 2007)*;  Chemetron Corp. v. Jones,* 72 F.3d 341 (3d Cir. 1995);  *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L.Ed. 865 (1950) ( "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *see also City of New York v. N.Y., N.H. & H.R. Co.,* 344 U.S. 293, 73 S. Ct. 299, 97 L.Ed. 333 (1953) (holding that known creditor was entitled to actual notice of claims bar date in railroad reorganization case before its lien could be extinguished by plan confirmation.).  The type of notice that is required depends on whether a creditor is "known" or "unknown."  Creditors whose identities are actually known to the debtor or are reasonably ascertainable by the debtor are deemed to be "known creditors" and are entitled to actual notice of the bankruptcy filing.  *J.A. Jones,*  492 F.3d at 249.  An "unknown creditor," by contrast, is one whose identity or claim is wholly conjectural, or whose interests or whereabouts cannot be determined by the debtor after exercising reasonable diligence.  *Id.* at 250.  An unknown creditor need not be given actual notice, and constructive notice, such as by newspaper publication, will suffice.  *Id* at 249-50 & n.6.

In *J. A. Jones*, the Fourth Circuit held that the administrator of the estate of an automobile accident victim was a "known" creditor of a construction company—and therefore entitled to actual notice of claim bar date before his wrongful death claim could be discharged in

8

the company's chapter 11 case—even though no lawsuit had been threatened or filed, when the company had extensively investigated the accident and had notified its insurance carrier. *J. A. Jones,* 492 F.3d at 244. The court went on to explain that "reasonable diligence" by the debtor in attempting to ascertain the identity of its creditors does not require a level of impracticality and does not require a vast, open-ended investigation; rather, the debtor's search should be concentrated on its own books and records. Furthermore, the court noted that there is no bright-line rule for distinguishing an unknown creditor from a known creditor and held that the analysis should focus on the totality of the circumstances in each case. *Id.*

Applying these principles to the case at hand, the court concludes that reasonable diligence by Piedmont in searching its records in August 2002 would not have identified Mr. Thomas as the holder of a claim against the company (other than for payments due under the retirement income plan), and that he was therefore an unknown creditor with respect to the claims he now asserts. The settlement of his grievance, after all, had occurred more than six years earlier. It would surely be stretching the notion of a "known" creditor to include any party with whom a claim or litigation had previously been settled, on the off chance that a dispute might someday arise as to the meaning or enforceability of the settlement. The whole point of a settlement, after all, is to lay claims to rest. The present case, however, does present the wrinkle that Mr. Thomas wrote to Piedmont on August 12, 2002, (the day following the first chapter 11 filing) describing himself as "a vested former employee" and stating, "I am interested in possibly starting my retirement pay." The letter asks for the "computed amounts" Mr. Thomas would

receive for various possible commencement dates and payment elections.[2] Included in the letter was the following paragraph:

> As an inducement for me to start the pay out earlier would Piedmont restore my pass privileges? It would be to Piedmont's advantage to both reduce the total cash outlay and avoid triggering Section-6 social security supplemental benefit payments at my normal retirement date.

Piedmont's reply, which is dated August 20, 2002, acknowledges Mr. Thomas's letter, states that benefit calculations would be requested from the plan actuary, and explains that Mr. Thomas was not eligible for reinstatement of travel privileges or social security supplemental benefit.[3] Mr. Thomas's exhibits do not include any further correspondence during the pendency of the first chapter 11 case in which he disputes or takes issue with that analysis. The court is unable to find that what appears on its face to simply be a routine inquiry concerning the computation of pension benefits was sufficient to put Piedmont on notice *at that time* that Mr. Thomas disputed the company's reading of the settlement agreement (which is not referenced in either his letter or the company's reply) or the pension plan. Absent some correspondence by Mr. Thomas taking issue with the company's position, the court is unable to conclude that Mr. Thomas had more than a wholly conjectural claim. For that reason, the court determines that Mr. Thomas was not a known creditor at the time the first chapter 11 case was filed.

      The Supreme Court has explained that constructive notice by publication is constitutionally sufficient when a creditor is unknown *City of New York,* 344 U.S. at 296. In the first chapter 11 case (as in the second), notice of the bankruptcy filing and of the bar date for

---

[2] Exhibit I to Mr. Thomas's post-hearing submission (Doc. # 4792).

[3] Exhibit P to Mr. Thomas's response (Doc. # 4783 and 4786) to the reorganized debtors' cross-motion for summary judgment.

filing proofs of claim was published in *The Wall Street Journal, The New York Times,* and *USA Today*. This court has previously held that publication in these three national newspapers is a reasonable and appropriate means of constructive notice. *In re US Airways, Inc.,* 2005 WL 3676186 at *6 (Bankr. E.D. Va., November 21, 2005). Accordingly, this court holds that Mr. Thomas, as an "unknown creditor," was given sufficient notice in the first US Airways bankruptcy case, and that any unperformed promise arising under the 1996 settlement agreement—other than his right to receive payments under the assumed retirement plan—was discharged upon confirmation of the joint plan on March 18, 2003, in the first chapter 11 case . *Id.*

B.

But even if the court's analysis is wrong, and Mr. Thomas's claim for retiree benefits in addition to his interest in the assumed retirement plan was not discharged by plan confirmation in the first chapter 11 case, the language in the settlement agreement preserving Mr. Thomas's "previously vested retirement interest" simply cannot carry the weight he ascribes to it. Settlement agreements, like any other type of contract, are to be given a natural and straight-forward reading. Mr. Thomas's interpretation would construe the language to, in effect, vest him (at age 48) with all the benefits he would have enjoyed had he continued in the company's employ until retirement age. The operative language, however, is "*previously vested* retirement interest" (emphasis added.) The common definition of "vested" is "fully and unconditionally guaranteed as a legal right, benefit, or privilege <the ~ benefits of the pension plan>". Webster's Ninth New Collegiate Dictionary 1312. The qualifying adverb "previously" plainly signifies

that the interest being preserved was one that had attached *prior to* the agreement and not one that arose as a result of it.

The question, then, is what benefits had "vested" prior to the settlement agreement. Although Mr. Thomas correctly notes that the collective bargaining agreement between ALPA and Henson (now Piedmont) confers a number of benefits upon retired pilots, the only reference to the *vesting* of a benefit is with respect to payments under the retirement income plan. Specifically, a pilot who had worked for the company for five or more years had a "vesting percentage" of 100% with respect to payments under the plan. The term "vesting" or "vested" is not used anywhere else in the collective bargaining agreement to refer to other types of retiree benefits. In particular, it is not used in connection with the social security bridge or retiree travel benefits. In fact, the language of the collective bargaining agreement is quite clear that those particular benefits only extend to those who work for the company until they retire. Specifically, the social security bridge is payable to a pilot "who is required by Federal law to retire prior to age 65 and *who retires from the employ of his Employer on Normal Retirement Date.*" (emphasis added).[4] Similarly, travel benefits are extended to "any pilot who has attained the age of 60 and has at least 10 years of active service as a Henson employee or who has attained the age of 55 and whose age plus years of active service as a Henson employee equals at least 70."

---

[4] Additionally, the court notes that the retirement plan's vesting provision, which is captioned "Termination of Employment and Vested Retirement Income," specifically addresses participants who terminate employment and are "*not eligible to receive retirement income* in accordance with the *preceding Sections*" (emphasis added). The "preceding Sections" address retirement at normal retirement age (Section 4), retirement within ten years of normal retirement age (Section 5), and the social security bridge (Section 6). By couching a *former* employee's vested interest as being *in lieu of* normal retirement, early retirement, *and* social security bridge, the plan rather plainly excludes former employees from entitlement to the social security bridge.

A straight-forward reading of the provision requires that the pilot still be in the employ of the company on the qualifying age. The side-letter reflects and confirms that understanding, since it grandfathers in only those pilots who were working for Henson on December 1, 1989, and who "leave employment *as a Henson pilot* at age 60." (emphasis added) Since Mr. Thomas did not continue in the employ of the company until retirement age, nothing in the collective bargaining agreement in effect at the time of the settlement agreement would have guaranteed him a right either to payment of the social security bridge or to retiree travel benefits. Put another way, the only "retirement interest" to which he had a guaranteed right prior to the signing of the settlement agreement was his right to receive payments under the retirement income plan. That right was excluded from the otherwise comprehensive terms of the general release of claims against the company that was incorporated in the settlement agreement. As a result, any rights not yet vested, including those benefits to which Mr. Thomas might have become entitled in the future had his employment continued until he could have retired, were quite plainly released. Accordingly, his proof of claim, to the extent it seeks such benefits, must be denied.

IV.

A separate order will be entered denying Mr. Thomas's motion for summary judgment and granting the reorganized debtors' cross-motion. However, the disallowance of his claim does not prejudice Mr. Thomas's right to receive payments on account of his previously vested interest in the assumed Retirement Plan for Pilots of Piedmont Airlines, Inc., nor does it

prejudice his right to bring an action against the company in any court of appropriate jurisdiction to enforce payment of benefits under the assumed plan.

Date: _____          _____
                                        Stephen S. Mitchell
Alexandria, Virginia                    United States Bankruptcy Judge

Copies to:

Roger N. Thomas
2149 Holy Oaks River Drive
Jacksonville, FL 32225-4886
Creditor *pro se*

Daniel F. Blanks, Esquire
McGuireWoods, LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, Virginia 23510-1655
Counsel for the reorganized debtors

Malcolm M. Mitchell, Jr., Esquire
Vorys, Sater, Seymour and Pease LLP
277 South Washington Street, Suite 310
Alexandria, VA 22314-3674
Counsel for the Official Committee of Unsecured Creditors

Dennis Early, Esquire
Assistant United States Trustee
115 South Union Street, Suite 210
Alexandria, VA 22314