UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: ) | |
| ) | |
| US AIRWAYS, INC., *et al.* ) | Case No. 04-13819-SSM |
| ) | Chapter 11 (Jointly Administered) |
| Debtors ) | |

**MEMORANDUM OPINION**

Before the court are two related matters. The first—on remand from the United States Court of Appeals for the Fourth Circuit—is the reorganized debtor's objection to Claim No. 3018 filed by Fougere Holcombe in the amount of $60,475,000 for alleged employment discrimination in violation of the Americans with Disabilities Act ("ADA").[1] The second is Ms. Holcombe's cross-motion to set aside the original order disallowing her claim.[2]

Ms. Holcombe's claim was disallowed by order of this court entered on April 2, 2007. *In re US Airways, Inc.*, 365 B.R. 624 (Bankr. E.D. Va. 2007). That ruling was affirmed by the United States District Court for this district on November 16, 2007, and on March 5, 2010, was largely affirmed by the United States Court of Appeals for the Fourth Circuit. *Holcombe v. US Airways, Inc.*, 369 Fed.Appx. 424 (4th Cir. 2010). The Court of Appeals, however, did reverse

---

[1] By separate orders, the court has denied Ms. Holcombe's motions (1) to stay the proceedings on remand until her motion in the district court to withdraw the reference and transfer venue to the Eastern District of New York is heard; and (2) for reconsideration of the order denying the motion.

[2] Ms. Holcombe has also objected to the debtor's motion for entry of a final decree closing the case. The joint plan proposed by the debtor, its parent holding company, and several affiliates, was confirmed on September 16, 2005, and Ms. Holcombe's claim is the last remaining matter in this case, all other objections and adversary proceedings having now been resolved.

and remand for consideration of whether discriminatory acts had been committed subsequent to confirmation of the plan in the debtor's first chapter 11 case. *Id.* at 428-29. The District Court, in turn, remanded to this court on June 7, 2010.

The reorganized debtor and Ms. Holcombe have each raised threshold issues. The debtor—in an infelicitously titled "Motion to Dismiss Remand"—asserts that whatever components of the claim survived the Fourth Circuit's ruling are now equitably and constitutionally moot, while Ms. Holcombe asserts that she is entitled to relief from the disallowance of her claim because the order was obtained by means of a fraud on the court.

## Background

Ms. Holcombe worked for US Airways, Inc. ("US Airways") at LaGuardia International Airport in Flushing, New York as a fleet service agent from 1992 to 2003, when she was placed on medical leave until her employment was terminated in 2006. US Airways has filed two chapter 11 petitions in this court. The first was filed on August 11, 2002. Ms. Holcombe did not file a proof of claim or request for payment of an administrative expense in that case, which culminated in confirmation of a plan of reorganization on March 18, 2003, with an "effective date" of May 15, 2003. She had, however, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 9, 2002—while the first case was pending—alleging violations of the ADA, and received a right to sue letter on July 2, 2003, approximately six weeks after the plan was confirmed. She thereafter filed suit in federal district court in the Eastern District of New York.[3] That suit was stayed by US Airways's second chapter

---

[3] *Holcombe v. US Airways Group, Inc. et al.*, No. 1-03-cv-04785-SLT-JMA (E.D. N.Y., filed September 19, 2003). In addition to US Airways and its parent holding company, Ms.

(continued...)

11 petition, which was filed on September 12, 2004. In the second case, she filed the proof of claim that is the subject of the present proceedings.

On motion for summary judgment, this court determined that Ms. Holcombe's claim had arisen prior to confirmation of the plan in the first US Airways case, and, because no proof of claim or request for payment of administrative expense had been filed in that case, was discharged by confirmation of the plan in the first case. That ruling was affirmed in its entirety by the district court for this district. On March 5, 2010, the Court of Appeals affirmed this court's determination that "all the important acts giving rise to Holcombe's original failure-to-accommodate claim arose when she filed her grievances with [US Airways's] Human Resources Department and/or filed a claim with the EEOC," and were therefore discharged by confirmation of the plan in the first case. *Holcombe,* 369 Fed.Appx. at 428. The Court also rejected Ms. Holcombe's "continuing violation" theory that her pre-confirmation claims persisted into the post-confirmation period. *Id.* The Court did hold, however, that "any claim arising from allegedly discriminatory acts by US Airways occurring after March 18, 2003 were not discharged by the Plan of [*sic*] confirmation" and that "if US Airways failed to select Holcombe for jobs for which she applied after March 18, 2003, such a claim has not been discharged." *Id.*

---

[3](...continued)
Holcombe's union, the International Association of Machinists and Aerospace Workers ("IAMAW") was also named as a defendant. The suit was administratively closed in November 2004 after the second chapter 11 petition was filed. In April 2008, Ms. Holcombe moved to reopen the 2003 lawsuit and, having obtained a new right-to-sue letter from the EEOC on January 23, 2008, also filed a new lawsuit, *Holcombe v. US Airways Group, Inc., et al.*, No. 1:08-cv-01593-SLT-JMA (E.D. N.Y., filed April 17, 2008), which has been consolidated with the 2003 action. At the time this opinion is written, Ms. Holcombe has filed a fourth amended complaint in that action, and the district court has set a briefing schedule on separate motions by US Airways and the IAMAW to dismiss the complaint.

Accordingly, the Court reversed the district court's affirmance of this court's ruling to the extent of "any claims arising from allegedly discriminatory acts and omissions occurring after the Confirmation Date" and remanded for a consideration of any such claim or claims. *Id*. at 429.

The confirmed plan in the second US Airways case did not provide for a cash payment to unsecured creditors (other than to a convenience class of creditors with claims not exceeding $50,000, who would receive a distribution equal to 10% of the amount of their claims). Rather, unsecured creditors would share pro rata in a pool of newly-issued common stock of the debtor's parent holding company (US Airways Group, Inc.) having an estimated value that was projected to provide a recovery ranging from 3.1 to 17.4 cents on the dollar, depending on the ultimate amount of allowed claims. Joint Plan of Reorganization § 5.1(i); Second Amended Disclosure Statement vi. The plan provided that no distributions would be made with respect to a disputed claim "unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim." Joint Plan of Reorganization § 9.8(b). "Final Order," in turn, is defined as:

> [A]n order or judgment, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal, *certiorari* proceeding or other petition, or proceeding for review or rehearing was filed or, if filed, remains pending.

Joint Plan of Reorganization § 1.68. The plan required the reorganized debtor, as disbursing agent, to create a Distribution Reserve equal to the number of shares the debtor reasonably determined to be necessary to satisfy the distributions required to be made to the holders of general unsecured claims "when the allowance or disallowance of each Disputed Claim is

*ultimately determined.*" Joint Plan of Reorganization § 9.8(c) (emphasis added). Distributions from the reserve would be made on the first periodic distribution date after the disputed claim became an allowed claim. Joint Plan of Reorganization § 9.8(c)-(d). As disputed claims were resolved, a catch-up distribution of shares freed up by the disallowance or withdrawal of a claim would be distributed to holders of previously allowed claims, with a final distribution being made "[a]fter a Final Order has been entered, or other final resolution has been reached with respect to all Disputed Claims." Joint Plan of Reorganization § 9.8(d).

The joint plan in the second US Airways case was confirmed on September 16, 2005. Following confirmation, the reorganized debtors filed a motion for an order establishing a disputed claim distribution reserve and setting and approving the reserve amount for certain claims, including Ms. Holcombe's. The proposed reserve amount for her claim was $50,000, but at a hearing on December 15, 2005, at which she appeared and objected, the court ruled that the reserve would be increased to $950,000. An order was entered on December 19, 2005, which included a reserve in that amount and provided, among other things:

> 3. The Reorganized Debtors are granted the authority to establish the Distribution Reserve by withholding a sufficient amount of Unsecured Creditors Stock to reserve for potential distributions to General Unsecured Creditors with Distribution Reserve Claims on a Pro Rata basis. The Reorganized Debtors are further granted the authority to adjust the Distribution Reserve, without further order of the Court, when and as each Distribution Reserve Claim is resolved by stipulation or final order.
>
> * * *
>
> 6. The Distribution Reserve Claims will only be paid from the Unsecured Creditors Stock available in the Distribution Reserve and no other accounts, reserves, or other sources of funds will be used to pay the Distribution Reserve Claims. As provided in the Plan, a holder of a Distribution Reserve Claim shall not be entitled to receive or recover any amount in excess of the amount provided in the Distribution Reserve to pay such Distribution Reserve Claim; provided, however, that to the extent a Distribution Reserve Claim asserts liability against

> multiple Debtors, such Claimant shall be entitled, upon allowance, to a distribution from the Unsecured Creditor Stock reserved for such Claimant regardless of which claim number provides for the reserve amount.

Ms. Holcombe filed a timely motion for reconsideration, which was ultimately resolved by a stipulation and order entered on March 23, 2006, increasing the reserve amount for Ms. Holcombe's claim to $2.3 million,[4] with all other "terms and provisions of the Distribution Reserve Order remain[ing] in effect."

This court's order granting the debtor's summary judgment motion and disallowing Ms. Holcombe's claim was entered on April 2, 2007, approximately twelve months after the order increasing the distribution reserve. Although Ms. Holcombe filed a timely notice of appeal and pursued the appeal all the way to the Fourth Circuit, she did not seek a stay pending appeal. In the interim, the reorganized debtor continued its efforts to resolve the remaining disputed claims, the last of which was resolved (by stipulation) on April 6, 2010. According to the debtor, the stock reserved for Ms. Holcombe's claim was distributed to other creditors while her appeal was pending, with a final distribution of stock having been made on or about April 13, 2010, leaving no further shares in the distribution reserve to "pay" Ms. Holcombe's claim, even if allowed.

---

[4] It is worth emphasizing that was reserved for Ms. Holcombe's claim was not stock having a value of $2.3 million, but rather stock sufficient to provide a pro rata distribution to her from the pool based on a maximum allowed claim of $2.3 million. The court is not advised as to the actual market value of the shares issued under the plan or the ultimate amount of allowed claims, but if the mid-point (10.3%) of the estimated percentage recovery set forth in the disclosure statement is any guide, what Ms. Holcombe would receive, if her claim were allowed in the full amount of the $2.3 million reserve, would be stock having a value of approximately $235,750.

Discussion

Based on the fact that Ms. Holcombe did not obtain a stay pending appeal of the order disallowing her claim and on the fact that all the shares of stock reserved for payment of unsecured claims have now been distributed, the reorganized debtors argue that whatever claims have survived the Fourth Circuit's remand are either equitably or constitutionally moot and must be dismissed. For her part, Ms. Holcombe argues that she is entitled under Rule 60(b)(3) to relief from the order disallowing her claim. The court will first address the debtor's motion, then Ms. Holcombe's.

I.

Ms. Holcombe makes several responses to the debtor's motion to dismiss for mootness. First, she questions the representation that no further shares remain for distribution,[5] and she asserts that in any event the distributed shares, or their value, are not beyond recall. She also denies that the debtor was entitled to distribute the shares reserved for her claim without notice to her, and she asserts that the debtor, not having raised the mootness issue before the Fourth Circuit, is estopped from now taking that position.

---

[5] The reorganized debtor's submission is notably lacking in any sort of detail concerning the number of shares distributed, and the remaining reserve for disputed claims, on each of the distribution dates since the order of April 2, 2007, that disallowed Ms. Holcombe's claim. Indeed, even the assertion that all the stock has now been distributed is not shown by affidavit but only by an unauthenticated (and incomplete) copy of a letter from the corporate secretary of US Airways Group to the stock agent dated April 13, 2010, directing issuance of the remaining 21,424 shares in the reserve. The motion for entry of a final decree, which was filed on February 16, 2009, reported that 2,066,336 shares, representing 98.9% of the pool, had been distributed to unsecured creditors as of that time. The Fourth Circuit's opinion was issued on March 5, 2010—six weeks prior to the date the debtor represents the final distribution of stock was made—although the mandate was not issued until May 6, 2010.

A.

Before reaching the issue of mootness, it is necessary to determine whether, as the reorganized debtor contends, Ms. Holcombe's failure to obtain a stay pending appeal permitted the reorganized debtor to distribute the shares that had been reserved for her claim. The court notes, initially, that there is something of a tension between the language of the plan—which refers at one point to disbursements being made only after allowance or disallowance of a claim is "*ultimately* determined" (emphasis added) and the order establishing the reserve, which allows the debtors to "adjust" the reserve without further order of the court as each disputed claim is resolved by stipulation or "final" order. That this court's order disallowing Ms. Holcombe's claim was a "final" order in the ordinary sense seems clear. An appeal of a bankruptcy court order does not stay the effect of the order unless a stay pending appeal is requested and received. *A & H Holding Corp. v. O'Donnell (In re Abingdon Realty Corp.)*, 530 F.2d 588, 589 (4th Cir. 1976). The problem here is that the plan expressly defines a "final order" as one (a) that has not been stayed, reversed or remanded <u>and</u> (b) is no longer subject to or pending appeal. Because the phrasing is in the conjunctive, a literal reading would deny finality if either condition was not satisfied. This is quite possibly not what the drafter of the definition intended, but the court must take the text as it finds it. Accordingly, the court would have to conclude that neither the confirmed plan nor the order establishing the reserve authorized the debtor to distribute the shares reserved for Ms. Holcombe's claim until the appeal process was concluded.

B.

That then raises the question of mootness. Mootness in bankruptcy may be of two types: constitutional or equitable. Constitutional mootness arises from the requirement that federal courts may hear only live cases and controversies. As the district court for this district has explained:

> [A]n appeal should be deemed moot in the constitutional sense whenever the judicial determination sought would have no practical effect. Thus, it is well established that courts must dismiss an appeal as moot if an affirmance "would ostensibly require something to be done which had already taken place," while a reversal "would ostensibly avoid an event which had already passed beyond recall." *Brownlow v. Schwartz*, 261 U.S. 216, 217-18, 43 S.Ct. 263, 264, 67 L.Ed. 620 (1923). Put colloquially, the governing principle is simply that courts should not engage in the useless task of closing the barn doors after the horses have fled. Cases reflecting this principle are legion.

*McLean Square Assocs., G.P. v. J.W. Fortune, Inc. (In re McLean Square Assocs., G.P.)*, 200 B.R. 128, 131 (E.D. Va. 1996) (footnote omitted). In addition to constitutional limitations, courts have also recognized equitable or prudential limitations on the ability of litigants to pursue claims in the bankruptcy context:

> Equitable mootness, as its name might imply, is more flexible than its constitutionally-based cousin. In essence, it enables courts to dismiss appeals . . . , even if effective relief could be fashioned, in order to avoid inequitable or unfair results. As defined by the Fourth Circuit, equitable mootness occurs "when implementation of the [reorganization] plan has created, extinguished or modified rights, particularly of persons not before the court, to such an extent that effective judicial relief is no longer practically available." *Central States, Southeast and Southwest Areas Pension*, 841 F.2d [92, 96 (4th Cir. 1988)]. Thus, whereas mootness in the constitutional sense involves the courts' "inability" to affect outcomes, equitable mootness deals with the courts' "unwillingness" to do so.

*Id.* at 132.

Having carefully considered the issue, the court is unable to find that Ms. Holcombe's claim has become moot simply because the reorganized debtor has improperly distributed to others the stock that would have been available for distribution to her on account of her claim. Although it seems clear that recovering the shares themselves (which are freely tradeable) is quite likely impossible, the court is nevertheless not persuaded that alternate relief could not be decreed. Such relief, for example, could take the form of a money judgment equal to the value of the shares that would have been distributed on account of the claim, to the extent it is ultimately allowed. Since the value of US Airways Group's shares obviously fluctuates from day to day, determining the appropriate date of valuation could be a challenge, but one the court need not undertake unless and until Ms. Holcombe is determined to have an allowed claim. That determination, of course, can only be made after an evidentiary hearing to resolve the issue specified by the Fourth Circuit in its remand order.

II.

Ms. Holcombe, however, asserts that she should be given an opportunity to litigate, not merely the issue remanded by the Fourth Circuit, but the entirety of her claim because the order disallowing her claim was obtained by a fraud on the court. Fed.R.Bankr.P. 9024; Fed.R.Civ.P. 60(b)(3).[6] She alleges, first, that US Airways hid from her and this court an agreement between the company and her union, the International Association of Machinists and Aerospace Workers

---

[6] Rule 60(b), Federal Rules of Civil Procedure, provides in relevant part as follows: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." A motion under Rule 60(b)(3) must be made within a reasonable time, and in any event, not later than one year after the entry of the judgment. Fed.R.Civ.P. 60(c)(1).

("IAMAW") in the first chapter 11 case under which claims of the union's members under federal anti-discrimination statutes survived confirmation of the plan; and second, that US Airways presented a fraudulently-altered document in support of the summary judgment motion that resulted in disallowance of her claim.

A.

The court will first address the altered document. Among the exhibits filed by US Airways in support of its summary judgment motion was a document purporting to be a letter from La'Shell Coleman (a US Airways human resources consultant) to Ms. Holcombe dated January 30, 2003. That this exhibit was a composite, consisting of the first page of a letter by Loretta Bove (the US Airways station manager at LaGuardia International Airport) dated January 30, 2003, and the second page of a letter by Ms. Coleman dated January 25, 2002, is not open to question. The misassembly of the pages apparently first occurred in connection with a deposition that was taken of Ms. Holcombe.[7] What is strange is that both letters from which it was created were already part of the deposition record. The 2002 Coleman letter was deposition exhibit 9, while the 2003 Bove letter was deposition exhibit 14. How page 2 of the first letter came to be combined with page 1 of the second letter to create deposition exhibit 19 is not explained, but the fact that it happened at all obviously reflects no credit on the professionalism of counsel.

Sloppiness, however, is not the same as fraud. Of course, if the exhibit had been a significant factor in the court's ruling, relief would be appropriate regardless of whether the substitution of a different second page was intentional or accidental. But having carefully

---

[7] The deposition and its exhibits were filed as Exhibit C to the summary judgment motion (Doc. #4332).

11

reviewed the original opinion, the court is unable to discern any possible impact that the erroneous document could have had on the court's ruling. The opinion correctly refers to and describes the contents of the 2002 Coleman letter[8] and the 2003 Bove letter[9] and makes no reference at all to a supposed January 30, 2003, letter from Ms. Coleman. Since the altered document played no part in the court's analysis, no basis exists for setting aside the summary judgment ruling simply because the document had been part of the record before the court at the time the summary judgment ruling was made.

B.

The second alleged fraud is the debtor's failure to disclose to Ms. Holcombe and the court that the confirmed plan in the first US Airways case preserved the individual claims of IAMAW members. In the first case, the IAMAW had filed three proofs of claim on behalf of its members.[10] Under the plan, the collective bargaining agreement ("CBA") between the debtor

---

[8] 365 B.R. at 627 ("A January 25, 2002, letter from La'Shell Coleman, a human resources consultant with U.S. Airways, denied Ms. Holcombe's request for a daylight shift because the daylight tower shift that she had prior to her medical leave of absence was no longer available and she lacked the requisite seniority to hold the position after the September 2001 reduction in force.").

[9] 365 B.R. at 627 ("On January 6, 2003, [Ms. Holcombe] again requested a daylight shift, but was informed by Ms. Bove in a letter dated January 30, 2003, that her request for a daylight position could not be met because no such position was available based on her seniority level.").

[10] Claim No. 4110 in the amount of $3,149,375.92; Claim No. 4924 in the amount of $1,200,000.00; and Claim No. 5574 in the amount of $2,784,139.80. Although a number of individual claimants are identified by name, others are identified only by grievance number. In any event, Ms. Holcombe is not listed by name as a member on whose behalf any of the three IAMAW claims was submitted.

and the IAMAW was assumed.[11] The CBA included, among other provisions, the following language:

> The Company and the Union agree to comply fully with all applicable Federal and State statutes and regulations prohibiting discrimination with respect to all aspects of employment with the company. Further, the Company and the Union agree that neither shall discriminate against employees covered by this Agreement on the basis of race, color, religion, sex, national origin, age, sexual orientation, *disability*, membership in a uniformed service, or status as a disabled veteran.

1999 Fleet Service Agreement Between US Airways and IAMAW, Art. I, ¶ E (emphasis added). Ms. Holcombe's argument is that the anti-discrimination language in the assumed CBA preserved her individual right to sue US Airways for violations of the ADA notwithstanding confirmation of the plan. The court cannot concur. What was preserved from discharge was not the right of individual union members to *sue* for violation of state and federal anti-discrimination statutes but the right to pursue such claims under the grievance and arbitration procedures set forth in the CBA. And, in fact, that is precisely what happened. Ms. Holcombe's grievances continued to be processed, and an arbitration hearing before the System Board of Adjustment under the CBA took place on September 24, 2009. The hearing resulted in a decision on March

---

[11] Specifically, § 8.1(c) of the plan provided in relevant part as follows:

> [A]ll collective bargaining agreements, as modified and/or amended from time to time, shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The assumption of the collective bargaining agreements and the cure of all amounts owed under such agreements in the ordinary course by the Reorganized Debtors shall be in full satisfaction of all Claims and Interests arising under all previous collective bargaining agreements between the parties thereto or their predecessors-in-interest. Upon assumption, all proofs of claim filed by the Debtors' unions will be deemed withdrawn, without prejudice to their pursuit in the ordinary course by the unions and/or individuals and payment or satisfaction in the ordinary course by the Reorganized Debtors of obligations under the assumed collective bargaining agreements.

22, 2010, denying her grievances.[12]  Ms. Holcombe, however, focuses on the plan language that the withdrawal of the union proofs of claim was "without prejudice to their pursuit in the ordinary course by the unions *and/or individuals*" (emphasis added).  In context, however, the language referencing pursuit of the claims by "individuals" rather plainly refers to claims arising under the CBA and cannot reasonably be construed as conferring on union members a right to pursue, post-confirmation, any and all claims the union member might have against the debtor, whether or not arising under the CBA.  Because Ms. Holcombe's present claim does not arise under the CBA but rather under the ADA, the court concludes that the claim (assuming that it was in fact embraced within one of the IAMAW proofs of claim) was not preserved by virtue of the plan language for "pursuit" outside the mechanisms provided by the CBA.  Accordingly, the court is unable to conclude that the order disallowing Ms. Holcombe's claim was obtained by the debtor's fraud, misrepresentation, or misconduct in failing to bring to her and the court's attention the provisions of § 8.1(c) of the confirmed plan in the first chapter 11 case.

---

[12] The specific issues addressed by the arbitration were (1) whether US Airways violated the CBA when it returned Ms. Holcombe to a shift assignment in 2002 that was different from the shift assignment she held when she went on leave of absence; (2) whether US Airways violated the CBA by combining two LaGuardia Tower job assignments into one; and (3) whether US Airways violated the CBA by deeming Ms. Holcombe to be separated from her employment after she failed to return from a leave of absence for more than three years.

III.

In summary, and for the reasons stated, the court declines to dismiss the remand proceedings as moot and also declines to set aside the summary judgment ruling based on the debtor's alleged fraud. A separate order will be entered consistent with this opinion denying both motions and setting an evidentiary hearing on the remanded issues.

Date: _____    _____
Stephen S. Mitchell
Alexandria, Virginia    United States Bankruptcy Judge

Copies to:

Fougere Holcombe
75-35 210 Street, 6D
Bayside, NY 11364

Douglas M. Foley, Esquire
McGuireWoods LLP
9000 World Trade Center
101 W. Main St.
Norfolk, VA 23510
Counsel for the reorganized debtor

Joseph A. Guzinski, Esquire
Assistant United States Trustee
115 South Union St., Suite 210
Alexandria, VA  22314